**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------ x
THELMA KERSHAW,                 :
                                :
        Plaintiff,              :   Civil No. 3:18-cv-1705 (AWT)
                                :
v.                              :
                                :
LOUIS DEJOY, POSTMASTER GENERAL :
OF THE UNITED STATES POST       :
OFFICE,                         :
                                :
        Defendant.              :
------------------------------ x
```

<u>**RULING ON MOTION FOR SUMMARY JUDGMENT**</u>

Plaintiff Thelma Kershaw filed a three-count Complaint against the Postmaster General of the United States Post Office.[1] The First Count is a claim that the defendant violated 42 U.S.C. §2000e <u>et</u> <u>seq.</u> ("Title VII") by discriminating against the plaintiff on the basis of her race and color and also by subjecting her to a hostile work environment. The Second Count is a discrimination claim brought pursuant to 29 U.S.C. §701 <u>et</u> <u>seq.</u> (the "Rehabilitation Act"); the Third Count is a retaliation claim brought pursuant to Title VII and the Rehabilitation Act. It was established during the plaintiff's deposition that the plaintiff has withdrawn the Second Count and Third Count. The defendant has moved for summary judgment with respect to the First Count.  For

---

[1] Megan Brennan was the Postmaster General named in the original complaint, and Louis DeJoy, the current Postmaster General has been substituted as the proper defendant.

the reasons set forth below, the motion for summary judgment is being granted.

## I.   FACTUAL BACKGROUND

Thelma Kershaw has worked for the United States Postal Service ("USPS") since 1987. Kershaw served as a Contract Technician at the Hartford Processing and Distribution Center (the "P&D Center") from December 4, 2010 to August 22, 2014. The plaintiff then served as a Mail Processing Clerk at the Hartford Washington Street Facility (the "Washington Street Facility") from August 23, 2014 through July 10, 2015. She held the same position at the Hartford Elmwood Facility (the "Elmwood Facility") from July 11, 2015 through October 2, 2015. On October 3, 2015, Kershaw was reassigned as a General Clerk to the Hartford Vehicle Maintenance Facility (the "Vehicle Maintenance Facility") where she currently works.

On October 5, 2016, while serving as a General Clerk at the Vehicle Maintenance Facility, the plaintiff initiated the Pre-Complaint Counseling process by filing an Information for Pre-Complaint Counseling Form. The plaintiff filed a second Information for Pre-Complaint Counseling Form with the assistance of counsel in November 2016. In both complaint forms the plaintiff made race discrimination and hostile work

environment claims. The plaintiff's administrative complaint was
closed with a finding of no discrimination on August 31, 2018.

In this action the plaintiff alleges in the Complaint that
certain events occurred on particular dates. However, during her
deposition, the plaintiff's testimony established that certain
events occurred when she worked at particular facilities, and
that if the dates alleged in the Complaint were inconsistent
with the plaintiff's testimony, then the dates alleged in the
Complaint are inaccurate.

The plaintiff states that a number of events on which she
relies to support her claims occurred while she worked at the
P&D Center, i.e. between December 4, 2010 and August 22, 2014.
In 2010, the plaintiff arrived at her office and found fellow
employees Jim Batcheller and Kevin Beluzo working on her
computer.

On another occasion, the plaintiff entered her office and
found Pat Nessing, an IT Specialist, under the plaintiff's desk
and Katheryn Buckbee, a Manger, standing against the wall. In
response to the plaintiff's inquiry as to what they were doing,
they indicated that there was a problem with the computers. The
plaintiff told them that she had not complained about any
problem with her computer, and the two of them smiled and left
her office. After Buckbee and Nessing left her office, several
black boxes appeared on the screen while the plaintiff was using

her computer. Soon thereafter, the plaintiff's keyboard, mouse, and screen became unresponsive to commands.

The plaintiff testified that she believed that the black boxes indicated that someone was downloading malicious software onto her computer, but she admitted that this was just her opinion. The plaintiff testified that she does not know who installed any alleged malware on her computer or who was responsible for it. She further testified that the computer issues did not occur every day and she did not notice any patterns.

Issues with her computer forced the plaintiff to call surrounding plants in order to complete her work-related tasks and forced her to spend substantial time after hours completing her work. The plaintiff testified that her computer got so bad in 2013 that she had to work on three different computers. She believes that her computer was intentionally sabotaged.

The plaintiff testified that she would lock her door when leaving her office and would return to find the door unlocked. She believes that co-workers were in her office after she had locked her door in June and July of 2013. One day, the plaintiff entered her office and found that her glasses had been broken and the pieces left in a pile on her desk; she does not know who broke her glasses or the date on which it happened. The plaintiff also testified that one day in June 2013, she

discovered that paperwork was missing from her desk and that
someone had gone through her paperwork after she had locked the
door to her office.

The plaintiff also contends that she was treated
differently from other employees because she was required to
unload a pallet of stock, and that another employee who is a
white Hispanic did not have to perform that task. She asserted
that her co-workers received special treatment because the
defendant required the plaintiff to take a typing exam, but a
white co-worker was not required to do so. However, during her
deposition the plaintiff admitted that, in fact, she never had
to take the typing exam.

The plaintiff testified that due to the hostile work
environment that she encountered at the P&D Center, she put in a
bid in August 2014 to leave the P&D Center to take a Mail Clerk
position at a new facility. Finally, the plaintiff states that
she suffered a nervous breakdown as a result of the harassment
she was subjected to between 2010 and 2014.

Kershaw testified that she did not encounter any computer
issues during the periods when she worked as a Mail Processing
Clerk at the Washington Street Facility and the Elmwood
Facility, i.e. August 23, 2014 through October 2, 2015.

On October 3, 2015, the plaintiff began working at the
Vehicle Maintenance Facility. Kershaw states that she again had

computer issues. Specifically, she encountered black boxes on her computer, and her mouse, keyboard and screen would become unresponsive to commands. Kershaw believes her computer was intentionally sabotaged while she worked at the Vehicle Maintenance Facility so she would be unable to do her job. She testified, however, that she does not know who sabotaged her computer. Also, when asked whether she believed the black boxes she encountered were in any way related to her race or color, her response was "I hope not." Mot. for Summ. J., Ex. B ("Kersh. Dep."), ECF No. 30-4 at 49:7-10. The plaintiff has produced no evidence as to what caused the computer issues, or whether the computer issues were related to a virus or malware.

The plaintiff testified that while she worked at the Vehicle Maintenance Facility, she noticed that someone had gone through paperwork on her desk and some paperwork was missing. The plaintiff has not identified who did this, nor the dates on which such conduct occurred. The plaintiff states that she only found her paperwork disturbed or missing twice or a few times (including the times it occurred at the P&D Center). The plaintiff testified that she never actually saw anyone in her office in connection with missing or disturbed paperwork.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987). Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law."  Id. at 248.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (internal quotation marks omitted) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. See Celotex Corp., 477 U.S. at 324. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact,"

Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)(quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41; see also BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996) ("[I]t is insufficient for a party opposing summary judgment merely to assert a conclusion without supplying supporting arguments or facts."). If the nonmovant fails to meet this burden, summary judgment should be granted.

## III. DISCUSSION

In the Complaint, the plaintiff alleges discrimination under two theories: the hostile work environment theory and the disparate treatment theory. In support of both claims, she relies on acts of discrimination that she failed to timely exhaust. Although she attempts to rely on the continuing violation exception, she cannot do so.

### A. Exhaustion of Administrative Process

"A person claiming to be aggrieved by a violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, may not maintain a suit for redress in federal district court until he has first unsuccessfully pursued certain avenues of potential administrative relief." Love Pullman Co., 404 U.S. 522, 523 (1972). "[T]he purpose of the exhaustion requirement . . . is to give the administrative agency the opportunity to investigate, mediate, and take remedial action . . . ." Stewart v. U.S.I.N.S., 762 F.2d 193, 198 (2d Cir. 1985). "[F]ederal employees are given 45 days from the date of the alleged discriminatory act in which to initiate administrative review of alleged employment discrimination." Fitzgerald v. Henderson, 251 F.3d 345, 359 (2nd Cir. 2001). "The 45-day period serves as a statute of limitations; thus, as a general rule, claims alleging conduct that occurred more than 45 days prior to the employee's initiation of administrative review are time-barred." Id.

A good number of the events on which the plaintiff relies to support her claims occurred when she worked at the P&D Center. The last day on which she worked at the P&D Center was August 22, 2014. Kershaw filed her initial administrative complaint on October 5, 2016, over 25 months later. Thus, she did not satisfy the requirement that her administrative complaint be filed within 45 days of the alleged discriminatory

act with respect to any of the events that occurred at the P&D
Center.

The plaintiff argues that her administrative complaint was
timely filed with respect to the events that occurred at the P&D
Center under the continuing violation exception. "Under the
continuing violation exception to the Title VII limitations
period, if a Title VII plaintiff files an EEOC charge that is
timely as to any incident of discrimination in furtherance of an
ongoing policy of discrimination, all claims of acts of
discrimination under that policy will be timely even if they
would be untimely standing alone." Lambert v. Genesee Hosp., 10
F.3d 46, 53 (1993)(internal citations omitted).

> Although the continuing violation exception is usually
> associated with a discriminatory policy, rather than
> with individual instances of discrimination, and
> although acts so "isolated in time . . . from each other
> . . . [or] from the timely allegations[ ] as to break
> the asserted continuum of discrimination" will not
> suffice, Quinn v. Green Tree Credit Corp., 159 F.3d at
> 766, a continuing violation may be found "where specific
> and related instances of discrimination are permitted by
> the employer to continue unremedied for so long as to
> amount to a discriminatory policy or practice." Cornwell
> v. Robinson, 23 F.3d 694, 704 (2d Cir.1994).

Fitzgerald, 251 F.3d at 359.

In Cornwell, the court concluded that there was a
continuing violation that began in 1981 and did not end until
the plaintiff left the employer in 1986, based on the following
evidence:

> [The district court] found that in 1986 Cornwell
> suffered the same kinds of harassment at the hands of
> some of the same YDAs, and under the aegis of some of
> the same supervisory personnel, as in 1981-1983. The
> [district] court found that the only reason the
> harassment had not continued in the interim between
> February 1983 and March 1986 was Cornwell's absence on
> account of the illness precipitated by the first set of
> incidents. Against the background of DFY's gender-
> discriminatory policies and the hostile work environment
> created by those male YDAs who sought to rid MacCormick
> of female YDAs, the [district] court properly concluded
> that the acts of discrimination and harassment by the
> individual defendants constituted a continuing wrong
> that did not end until April 1986, when Cornwell was
> finally driven from MacCormick for good. Cornwell's
> original complaint, filed in June of that year, was
> therefore timely.

Cornwell v. Robinson, 23 F.3d 694, 704 (2nd Cir. 1994).

Kershaw cannot rely on the continuing violation exception.
First, "a plaintiff may not rely on a continuing violation
theory of timeliness unless she has asserted that theory in the
administrative proceedings. See, e.g., Miller v. International
Telephone & Telegraph Corp., 755 F.2d at 25." Fitzgerald, 251
F.3d at 360. The first time that Kershaw raised a continuing
violation theory was in her opposition to the defendant's motion
for summary judgment. She did not raise it during the
administrative proceedings, or even in the Complaint.

Second, the plaintiff has not produced evidence that there
were specific and related instances of discrimination that were
permitted by the employer to continue unremedied. The plaintiff
asserts that "the exact same problems materialized  in the same

-12-

manner at all four of the defendant's facilities." Plaintiff's
Memorandum of Law in Support of Her Motion in Opposition to
Defendant's Motion for Summary Judgment, at 13, ECF No. 33. The
plaintiff testified that she noticed that someone had gone
through paperwork on her desk and that paperwork was missing
while she worked at the P&D Center. She also testified that she
returned to her office, on an unspecified number of occasions,
to find that the door had been unlocked, and that on one
occasion she found that her glasses had been broken. The
plaintiff also testified that someone went through paperwork on
her desk and that paperwork was missing while she worked at the
Vehicle Maintenance Facility. But the plaintiff testified that
her paperwork was disturbed and/or missing only a few times in
total. (See Defendant's Local Rule 56(a)(1) Statement of
Undisputed Material Facts, at ¶36; see also Kersh. Dep. at 62:9-
63:3). There is no evidence that any such incidents occurred at
the Washington Street Facility or the Elmwood Facility. Also,
there is no evidence as to who was or may have been responsible
for even one of these acts at either the P&D Center or the
Vehicle Maintenance Facility. Thus, there is no basis for a
conclusion that these are specific and related incidents.

The plaintiff states that while she worked at the Vehicle
Maintenance Facility she encountered computer problems,
specifically that she found black boxes on her computer and that

her computer mouse, keyboard and screen became unresponsive. The plaintiff does not claim that she encountered computer problems while she worked at the Washington Street Facility or the Elmwood Facility. The plaintiff testified that she encountered computer problems when she worked at the P&D Center in 2010 after finding Kevin Beluzo and Jim Batcheller working on her computer and then again in 2014 after finding Kathy Buckbee and IT Specialist Pat Nessing in her office. The plaintiff has produced no evidence that she encountered computer problems at the Vehicle Maintenance Facility after someone had been at her workstation. Nor does the plaintiff produce any evidence that could support a conclusion that her computer was sabotaged, nor with respect to any specific person being involved with her computer at both the P&D Center and the Vehicle Maintenance Facility. Thus, there is no basis for a conclusion that any incident at the P&D Center is related to an incident at the Vehicle Maintenance Facility.

Also, with respect to both the paperwork on her desk being disturbed or missing and the computer problems that the plaintiff encountered, Kershaw fails to produce evidence that could support a conclusion that the employer permitted such problems to continue unremedied. For example, the plaintiff produces no evidence that any person with authority to address her concerns was notified of the problems she was encountering.

-14-

The plaintiff's first day working at the Vehicle Maintenance Facility was October 3, 2015. She initiated the Pre-Complaint Counseling process on October 5, 2016. The plaintiff does not give specific dates for the incidents that occurred while she was working at the Vehicle Maintenance Facility, so it is unclear whether she initiated the administrative review with respect to those incidents within 45 days from the date of the alleged discriminatory act. The court assumes for purposes of this ruling that she did so.

### B. Disparate Treatment

"Under McDonnell Douglas, a plaintiff alleging disparate treatment under Title VII must first make out a prima facie case by demonstrating that: (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." U.S. v. Brennan, 650 F.3d 65, 93 (2nd Cir. 2011); see also Fitzgerald, 251 F.3d at 356. "The burden of proof that must be met to permit a Title VII plaintiff to survive a summary judgment motion at the prima facie stage has been characterized as 'minimal' and 'de minimus.'" Falcon v. Connecticut Judicial Branch, 2018 WL 5993922, at *6 (D. Conn. Sept. 25, 2018)(citing to Jute v. Hamilton Sundstrand Corp., 420

F.3d 166, 173 (2d Cir. 2005)). Here, however, the plaintiff has failed to meet even that de minimus burden with respect to the third and fourth elements.

For the reasons discussed above, the plaintiff can only rely on incidents that occurred while she was working at the Vehicle Maintenance Facility. Kershaw states that she had computer issues, i.e. encountering black boxes on her computer and her mouse, keyboard and screen becoming unresponsive to commands. Kershaw has, however, produced no evidence as to what caused the computer issues or whether they may have been related to a virus or malware. Kershaw also testified that she noticed that someone had gone through paperwork on her desk and some paperwork was missing.

The third element of a prima facie case is that the plaintiff was subjected to an adverse employment action. An adverse employment action is a "materially adverse change in the terms and conditions of employment." Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotations and citations omitted).

> A materially adverse change must be more disruptive than a mere inconvenience or an alteration of job responsibilities and can include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.

Falcon, 2018 WL 5993922 at *6 (citing Hrisinko v. N.Y. City
Dep't of Educ., 369 F. App'x 232, 235 (2d Cir. 2010)
(internal quotation marks omitted)). For example, "a forced
transfer . . . is not an adverse employment action if the
terms, privileges, duration, or condition of a plaintiff's
employment do not change." Pimentel v. City of New York, 74
F. App'x. 146, 148 (2nd Cir. 2003).

     Here, the plaintiff had computer issues in the form of
encountering black boxes and her computer becoming
unresponsive, and she also noticed that someone had gone
through paperwork on her desk and some paperwork was
missing. There were no changes in the terms, privileges, or
duration of the plaintiff's employment. Nor was there any
material change in the conditions of the plaintiff's
employment such as significantly diminished responsibility.
What the plaintiff encountered was not sufficiently
disruptive to rise to a level of a material adverse change
in the conditions of her employment.

     The fourth element of a prima facie case is that the
adverse action occurred under circumstances giving rise to
an inference of discrimination. Here, the plaintiff has
provided no evidence of circumstances that give rise to an
inference of discrimination. In fact, when asked whether
she believed that the black boxes she encountered on her

computer screen were in any way related to her race or color, her only response was that she hoped that they were not.

Thus, the defendant is entitled to summary judgment on the plaintiff's disparate treatment claim.

### C. Hostile Work Environment

To prevail on a hostile work environment claim, the plaintiff must show: "(1) that her workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2nd Cir. 1996)(internal citations omitted). "A court should consider the offensiveness of the defendant's conduct, its pervasiveness, and its continuous nature." Kotcher v. Rosa and Sullivan Applicance Center, Inc., 957 F.2d 59, 62 (2nd Cir. 1992). As a general rule, an employer will not be held liable for a hostile environment created by coworkers or low-level supervisors . . . unless "[t]he employer has either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." Murray v. New York Uni. College of Dentistry, 57 F.3d 243,

249 (2nd Cir. 1995)(internal quotation marks omitted)(citing
Kotcher, 957 F.2d at 63).

As discussed above, Kershaw states that she had computer
issues, i.e. encountering black boxes on her computer and her
mouse, keyboard and screen becoming unresponsive to commands.
Kershaw has, however, produced no evidence as to what caused the
computer issues or whether they may have been related to a virus
or malware. Kershaw also testified that she noticed that someone
had gone through paperwork on her desk and some paperwork was
missing.

Kershaw has failed to create a genuine issue of material
fact with respect to either element of a hostile work
environment claim. Looking at her factual contentions in terms
of the offensiveness of a defendant's conduct, its pervasiveness
and its continuous nature, Kershaw has failed to produce
evidence that could establish that her work environment was
permeated with discriminatory intimidation that was severe or
pervasive. In addition, she has provided no evidence that could
be a basis for concluding that the conduct she reports can be
imputed to the employer. There is no evidence that the employer
either provided no reasonable avenue for complaint or knew of
the incidents and did nothing about them.

Thus, the defendant is entitled to summary judgment on the plaintiff's hostile work environment claim.

## IV.  CONCLUSION

For the reasons set for above, the defendant's Motion for Summary Judgment (ECF No. 30) is hereby GRANTED.

The Clerk shall enter judgment in favor of the defendant on all counts in the Complaint and close this case.

It is so ordered.

Dated this 30th day of March 2021, at Hartford, Connecticut.

              /s/ AWT
        Alvin W. Thompson
    United States District Judge
